2020 IL App (2d) 190643-U
No. 2-19-0643
Order filed April 7, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF PERRY MOY | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 04-DV-685 |
| | ) | |
| MIRIAM MOY, | ) | Honorable |
| | ) | Mary H. Nader, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in terminating maintenance.  Affirmed.

¶ 2    Respondent, Miriam Moy, appeals from the trial court's order, granting petitioner's, Perry Moy's, motion to terminate maintenance.  We affirm.

¶ 3                                I. BACKGROUND

¶ 4    The parties were married on June 28, 1982, and their marriage was dissolved on March 14, 2008.  Both parties were represented by counsel in the dissolution proceedings.  The dissolution judgment incorporated a marital settlement agreement (MSA).  Section 4.1 of the MSA, which was in the maintenance article of the agreement, provided:

"4.1  HUSBAND shall pay to WIFE the sum of $6,000 per month on the first of each month via an electronic deposit into WIFE'S account commencing upon the sale of 8220 Crystal Springs Road.  Said sum shall *not* be included in WIFE'S income and shall *not* be deductible by HUSBAND from his income for federal and state income tax purposes.  If said sum is not paid by the first of each month a late fee of $50.00 per day shall accrue after the seventh of that month.  Said sum is non-modifiable for a period of nine (9) years, at which time either party may seek a modification by petitioning the court.

HUSBAND shall continue to pay $3,000.00 per month, payable on first of each month as well as maintain payments delineated in paragraph 5.1, until the 8220 Crystal Springs Road real estate is sold.  Wife shall be granted the right to stay in the marital home during the period of time that the home is readied for sale pursuant to paragraph 5.1 herein."  (Emphases in original.)

¶ 5    Section 5.1 of the MSA provided that Miriam had a right to receive up to $400,000 from any remaining proceeds from the sale of both the marital home and an adjacent lot.

¶ 6    On August 28, 2018, Perry moved to terminate or, alternatively, modify maintenance, arguing, as relevant here, that there was a substantial change in circumstances, in that Perry had retired and sold his business; his income was substantially less than at entry of the dissolution judgment; Miriam's income had increased since that time; Miriam, contrary to the judgment, had not sold the former marital residence; Miriam continues to live in the residence; and her financial needs have significantly decreased since entry of the dissolution judgment.  Perry also asserted that Miriam had willfully failed to make efforts to become self-supporting.  Perry attached to his motion a financial affidavit.  He asserted that he had $98,338 in prior-year income, is currently unemployed, and that his income consists solely of social security income ($1,583 per month).

Perry listed the following monthly deductions: $1,502 that the State garnishes for unpaid taxes (of $75,000); $1,951 for life-insurance premiums; and $3,000 in maintenance. He listed $5,896 in monthly personal expenses. Perry also listed that, in May 2018, he sold his restaurant to Plum Garden, LLC, for $200,000 and sold property to Guy Youmann for $105,000. He also stated that he had filed for bankruptcy in the last five years.

¶ 7 Miriam, *pro se*, filed a response and a financial affidavit. She stated that she is unemployed and had an "involuntary bankruptcy" filed against her (in 2012). She listed $200 in rental income and over $1,700 in monthly personal expenses.

¶ 8 In September 2018, Perry was held in contempt for failure to pay maintenance (for January 2012, July 2018, and August 2018). He purged that finding on October 10, 2018.

¶ 9 On November 2, 2018, Miriam moved to strike and dismiss Perry's motion and several additional filings related to depositions and interrogatories. The trial court denied the motion. On December 3, 2018, the trial court ordered that maintenance was abated until hearing on Perry's motion to terminate/modify maintenance. On April 16, 2019, Miriam moved to dismiss Perry' motion, citing federal rules and arguing that Perry falsified his financial affidavit. The trial court denied the motion, finding that the federal rules did not apply in state court and that Miriam's allegations were properly raised at an evidentiary hearing, not in a motion to dismiss.

¶ 10 On February 21, 2019, a hearing commenced on Perry's motion to terminate maintenance. Perry called Miriam as an adverse witness. Miriam, age 57, testified that she lives in the former marital home at 8220 Crystal Springs Road in Woodstock. She is not employed and had brain surgery and was "a little slower." Miriam was last employed in February or March 2017 as a waitress, during which she worked between 20 and 30 hours per week and earned about $10,000 per year. She worked at that job for two to three years. Prior to that, Miriam worked as a server

for other companies, earning between $8,000 and $11,000 per year. From the time of the parties' divorce in 2008, Miriam continuously worked as a server until February or March 2017. The most she ever earned was $11,000 per year. She stopped working (she could not recall if she quit or was fired) because she was sick; she did not apply for unemployment compensation because she does not know how to, but acknowledged that she had filed her pleadings *pro se* in this case for the last six months. Miriam also could not recall if she applied for social security disability benefits and stated she did not know how to apply, but had testified at her deposition that she had not applied because she was getting better.

¶ 11     Since leaving her last job, she has not applied for any work, explaining that "I've been in court since." When asked again about her last job, Miriam stated that she last worked there in February 2016. She was not able to work due to vertigo, high blood pressure, and a brain tumor. She did not apply for disability benefits because she does not know how to, does not have counsel, and does not have health insurance.

¶ 12     Addressing her income, Miriam testified that she receives several hundred dollars per month (she later testified she receives the money per week) from her sister for help paying utilities and other bills. She has a verbal agreement with her sister that the monies are a loan. Miriam does not know how much she owes her. She started receiving help from her sister around 2017. Miriam also receives $3,000 per month in maintenance.

¶ 13     Miriam owns three vehicles, two of which she acquired after the divorce, specifically, used vehicles she purchased from neighbors. She owns them outright, with no debt. The only working vehicle is a small BMW that she purchased a couple of years ago.

¶ 14     Miriam lives in a five-bedroom, 5,000-square-foot home that was built in 1988. She lives there with Stanley Cotton, who began living at the house at the time of the divorce. Miriam

explained that Cotton is a boarder, not her boyfriend. However, she has vacationed with him and spends some holidays with him. Cotton pays between $300 and $400 per month in rent. Miriam deducts monies when Cotton performs maintenance services on the house. Cotton has access to the basement, the kitchen, and the garage.

¶ 15    The parties' children lived with Miriam until 2006. She could not recall the last time she communicated with any of her three children, other than seeing Jason testify in federal court.

¶ 16    Miriam further testified that the parties still own the former marital residence. The MSA stated that it was to be sold. (It is currently in foreclosure, and she is contesting it.) Miriam did not list the house until 2010, after she was held in contempt for not listing it for sale. She stated that she listed it to purge herself of the contempt finding. The house was listed from 2010 to 2016 for about $500,000. The house has not been listed since 2016. Miriam has not paid any mortgage payments on the house. The adjacent lot has not been sold. (The MSA provided that the adjacent be "immediately" listed.)

¶ 17    Miriam has not sought schooling/education since the divorce judgment. She went to a temporary agency a handful of times (she could not recall if it was before or after the divorce), was tested, was told that she did not qualify for white-collar work, and was informed that she should purchase programs/tutorials. She borrowed CDs from friends. Miriam never enrolled in job-training programs or classes. During the day, Miriam cares for her mother and stepfather. In the evenings, she researches for her lawsuits. Many of Miriam's debts were discharged in bankruptcy.

¶ 18    Perry, age 67, testified that he lives in a condo in Woodstock. He owned Plum Garden restaurant in McHenry until 2018, when he sold the business (for $200,000) to his children's limited liability company. The terms of the sale of the business, after factoring in income tax liabilities and other items, provided that Perry received a note that paid $1,504 per month over 25

years. However, he does not receive any payments because the Department of Revenue intercepts the payments. Perry's outstanding debt with the Department of Revenue is about $30,000. He sold the property on which the business was occupied in October 2017 for $109,000, but there was a mortgage on the property for $100,000. Thus, after factoring in closing costs, Perry did not receive any proceeds from that sale.

¶ 19    Perry's income consists of social security benefits of $1,648 per month. He has a $250,000 mortgage on his home, but the home is in foreclosure and he has a short sale contract pending for $200,000. Perry is also a named party in the foreclosure proceeding on the former marital residence. (There is no encumbrance on the adjacent lot.) At the time of the dissolution judgment, Perry contemplated that the vacant lot was worth between $250,000 and $350,000. As for the former marital home, he testified that the mortgage was about $400,000 and he believed the home could have sold for between $650,000 and $850,000 at that time. Once the home was ultimately listed in 2012, its appraised value was about $450,000. Miriam did not allow Perry to participate in the listing, marketing, or showing of the property.

¶ 20    Perry had open heart surgery in 2002, but continued to work the same hours afterwards (*i.e.*, 80 to 100 hours per week). At the time of the divorce, Perry's income was over $100,000 per year. Perry has not filed his tax returns for the years 2015 through 2018, because his accountant is negotiating a payment plan with the IRS. If he filed his 2015 return, he would add about $10,000 to his debt. If he filed his 2016 return, he would add $21,499 in debt. In 2016, with nudging from his sons, Perry cut back his work hours. He had developed chronic Achilles tendon issues and could stand for no more than three hours at a time. In 2017, after having worked 80 to 100 hours per week for 50 years, Perry decided to step back from the business and became a W-2 wage earner

(*i.e.*, employee of the restaurant) and hired more employees. Perry's health concerns motivated the sale of his business in 2018.

¶ 21    Perry further testified that his 2018 income consisted of social security benefits (about $18,000 to $20,000 after garnishments for federal taxes and a personal loan). He no longer pays for life insurance; he let it lapse in May 2018. Perry stated that he no longer pays the $3,000 in maintenance. He also stopped making mortgage payments in May 2018. He is current on his real-estate taxes because there were funds in escrow. Perry does not have a car. He gets around by using ride-share services or borrowing a car. Perry believes that his state tax debt is about $45,000, without including any 2018 liability. He has about $2,000 in credit-card debt and between $5,000 and $6,000 in medical debt.

¶ 22    Perry borrowed $3,000 from his son, Jason. He has a promissory note memorializing the terms of the loan and has not made any payments on it. Jason is charging 4% interest. Perry also listed Main Street Financial as a debt. He explained that he borrowed $10,000 to pay to Miriam after he was held in contempt. Payments are being made on this debt by way of garnishment of his social security benefits (about $378 per month at 34% interest). The balance of Perry's checking account is $700.

¶ 23    When questioned about the former marital residence, Perry initially stated that he believed that he quitclaimed his interest in it to Miriam. Later, he acknowledged that he was named in the foreclosure proceedings related to the home. His failure to list it as an asset on his financial disclosure was a "mistake." Perry does not believe that he will receive any proceeds from the sale of that property and there is no equity in it. He does not own any motor vehicles, business interest, retirement assets.

¶ 24    On cross-examination by Miriam, Perry testified that he retired on May 1, 2018. Miriam used several exhibits during cross-examination, but never offered them into evidence. After Miriam complained that she could not connect her thoughts, the court recessed for the day and directed Miriam to obtain a doctor's note stating she could proceed to represent herself. [1]

¶ 25    Perry admitted to several mistakes in his financial affidavit, including using the restaurant address as his personal address, listing a vehicle payment when he no longer owned the car, and listing utilities expenses when he was not paying such expenses. He forgot to list anything under real estate in his financial affidavit. Marking defendant's exhibit No. 1, the loan documents from One Main Financial, Miriam attempted to have the documents received in evidence, but Perry could not authenticate them because he could not read them due to the small font (which the trial court also noted). Perry testified that he borrowed a total of $10,000 at an interest rate of 34%. The first loan was for $5,000, and the second loan was for $10,000, but he was required to pay off the first loan with the proceeds. Thus, his total proceeds were $10,000. Miriam believed that he received $15,000 and used several documents during her cross-examination to solicit testimony concerning the calculations, but never offered them into evidence. Perry filed for bankruptcy, but it was not approved. He filed a tax return for the 2015 tax year, but not for 2016, 2017, and 2018.

¶ 26    At one point, the trial court explained to Miriam the sale of the restaurant. The court noted that the assets of Plum Garden, Inc., were sold to Plum Garden, LLC. Perry explained that he sold

---

[1] On February 27, 2019, the trial court entered an order, requiring Miriam to present a note of competency to represent herself. A physician's note stated that Miriam was "psychiatrically stable to represent herself in a legal proceeding," but "probably needs extra time to formulate her thoughts and *speak* them." (Emphasis in original.)

food inventory, liquor inventory, all other inventory, equipment, fixtures, goodwill, and intellectual property. The trial court sustained numerous objections to Miriam's questions and, on many occasions explained to Miriam why her questions were not appropriate. Late during her questioning, the court clarified that none of Miriam's exhibits had been admitted into evidence. Perry testified that, currently, Plum Garden Restaurant, Inc., does no business other than receiving promissory note payments (on its $200,000 loan to the LLC) as a result of the sale transaction. Perry does not receive any income, dividends, or profit from the business.

¶ 27 Perry pays $1,500 per month to the State for unpaid taxes and $244 per month for a lien by the IRS. A foreclosure judgment has been entered in his home in Woodstock, and he has to leave the premises within one week.

¶ 28 Perry has no cash, either in his wallet or home; he does not keep money in the bank. Social security is his only source of income. Perry testified that he does not have the ability to pay Miriam $3,000 or more per month. He does not expect this to change and has no employment prospects. Between April 2018 and January 2019, he applied to six or eight facilities for employment but was rejected.

¶ 29 Perry filed two 2015 tax returns. The first, a copy of which was not admitted into evidence and was used by Miriam during her case-in-chief, stated that his adjusted gross income was $83,816. A subsequent version, which was slightly revised and a copy of which was admitted into evidence without objection, was not filed and states that Perry's adjusted gross income was $85,970 and shows $2,000 in additional income. Copies of his 2016 and 2017 unfiled returns were also admitted into evidence without objection. Perry testified that each payment on the promissory note has been intercepted by the state and that he has personally received no payments.

¶ 30    Miriam testified that she first listed the marital home for sale on October 28, 2010, after being held in contempt. She listed the vacant lot about March 18, 2008. She stated that, pursuant to the MSA, she was awarded only the right to remain in the marital home until it was sold and that Perry was awarded all assets, the business, all vehicles, etc.

¶ 31    At one point during the proceedings, the court commented:

"Well, to be honest, Miriam, we have been very, very patient with you. You have continued his case several times. We actually yesterday [*sic*] you were taking 40 to 50 seconds between questions and nobody said anything. We all just sat in silence and waited for you to shuffle through papers to find things and [Perry's counsel] never objected, I never said anything other than if we're going to get done today, we need to pick up the pace. So I think we've been very patient and very considerate."

¶ 32    On cross-examination, Miriam testified that she is current on payment of the expenses listed on her financial affidavit, except that she makes lower payments to her former counsel. In addition to her sister, Miriam's mother, stepfather, and brother are helping her pay her expenses. She also conceded that, pursuant to the divorce, she received personal property, including artwork and artifacts that she subsequently sold to pay expenses. Miriam was denied social security disability benefits, and she did not re-apply.

¶ 33    After closing argument, the court commented:

"THE COURT: I do have to comment for the record that the Miriam Moy who just did the closing argument is I think a totally different person than the person who was conducting this hearing. During the hearing, you acted confused or you were confused and took pause between everything. And your closing argument was very articulate, very well thought out. You didn't miss a beat. You didn't pause once. I commented that yesterday

we had long pauses between questions and statements, so the argument you just gave for 14 minutes was different than—your whole demeanor is different than anything I've seen in the last two days or any hearing dates prior to this. So I do just want to make that comment for the record."

¶ 34     On June 19, 2019, the trial court issued is memorandum decision and order. It found that both parties lacked credibility. Addressing Miriam's financial affidavit, the trial court noted that many of the debts listed were discharged in bankruptcy, according to Miriam herself. The affidavit, the court noted, was not properly completed, but appears to show $1,395 in monthly expenses, $300 in transportation expenses, and $243.10 in monthly personal expenses. The court determined that the monthly debt payments were unclear, because of the bankruptcy and Miriam's statement that she is voluntarily paying a debt that was discharged; however she listed $950 in monthly payments (for a total of $2,888.10 per month). She also has $1,400 in credit-card debt. The court further found that, "[t]hroughout the hearing, Miriam's speech was labored and slow. She paused 40-50 seconds between questions when cross examining. She paused before answering any questions. Yet, her closing argument when she said Perry came to court with dirty hands and he is a proven liar, was very quick, clear and concise."

¶ 35     The trial court further found that Perry does not have the ability to pay maintenance. At the time of the divorce, he was earning over $100,000, but he currently earns only $19,776 per year, some of which is intercepted by the federal government. The court noted that Perry also receives $1,504 per month from the sale of an awarded marital asset, but that is also intercepted. "He has sold the assets awarded to him in the divorce; he is 67 years old and is retired and not working. He does not have the ability to pay maintenance."

¶ 36    Next the court found that, at the time of the divorce, Miriam earned between $8,000 and $10,000 per year, but now has no earnings. "Yet she owns two BMWs and a Suburban, two of which were acquired after the divorce." She has lived in the marital home without paying any housing costs for 11 years. She has not acquired education since the divorce, is not eligible for social security, and has not applied for unemployment or disability. "She has done nothing to help herself. *** Yet, somehow her needs are being met[.] She is only charging Stanley Cotton $200-$400 per month to live in a 5,000-square-foot Bull Valley home, which is unconscionable. She was to receive the first $400,000 from the sale of the marital residence." The sale never occurred. The court further found that that the dissolution judgment "anticipated Perry's retirement when it set the maintenance for a nine-year term after the sale of the marital residence"; however, the court further determined that there were allegations that Miriam "frustrated" the sale of the marital residence. It also determined that both parties are insolvent and that neither one is "living a 'high' life." Perry had shown a substantial change in circumstances.

¶ 37    Applying the statutory factors, the trial court granted Perry's motion and ordered that maintenance be terminated as of January 1, 2019. Miriam, *pro se*, appeals.

¶ 38                                    II. ANALYSIS

¶ 39    Miriam argues that the trial court erred in terminating maintenance. For the following reasons, we disagree.

¶ 40    Under the Illinois Marriage and Dissolution of Marriage Act (Act), "[a]n order for maintenance may be modified or terminated only upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a-5) (West 2018). "A 'substantial change in circumstances' as required under [the Act] means that either the needs of the spouse receiving maintenance or the ability of the other spouse to pay that maintenance has changed." *In re Marriage of Shen*, 2015

IL App (1st) 130733, ¶ 132. The party seeking modification or termination has the burden of establishing such a change. *Id.*

¶ 41 Section 510(a-5) of the Act sets forth several factors that the trial court must consider when deciding whether to modify or terminate maintenance, including:

"(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage *** and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage ***; and

(9) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/510(a-5) (West 2018).

¶ 42 Section 510(a-5) also requires that the trial court consider the factors relevant to a determination of an initial maintenance award set forth in section 504(a) of the Act. *Id.* §§ 504(a),

510(a-5). Those factors include the parties' income, property, and needs; the parties' realistic future earning capacities and any impairments to those earning capacities; the time necessary for the party seeking maintenance to acquire appropriate education, training, and employment; whether the party seeking maintenance is able to support himself or herself through appropriate employment; the effect of parental responsibility arrangements on the party seeking employment; the standard of living during the marriage; the duration of the marriage; each party's age, health, station, occupation, amount and source of income, vocational skills, employability, estate, and liabilities; tax consequences to each party; contributions and services by the party seeking maintenance to the education, training, or career of the other party; any valid agreement of the parties; and any other factor that the trial court finds just and equitable. *Id.* § 504(a).

¶ 43    We review a trial court's decision to terminate maintenance for an abuse of discretion. *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009).  A trial court abuses its discretion where no reasonable person would take the view adopted by the trial court.  *In re Marriage of Bernay*, 2017 IL App (2d) 160583, ¶ 13.  When a party challenges a trial court's factual findings regarding a maintenance determination, we will not reverse a trial court's findings unless they are against the manifest weight of the evidence.  *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1041 (2008).  Findings are against the manifest weight of the evidence where they are unreasonable.  *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 61 (2009).

¶ 44    First, Miriam argues that the trial court erred in admitting her financial affidavit.  She contends Perry has the burden of proof to show a substantial change in circumstances, and her affidavit is not relevant to this determination.  We disagree.  Miriam misconstrues the law.  See 750 ILCS 5/504, 510(a-5) (West 2018) (court must consider income and property of each party, financial obligations changes in the parties' income since the prior judgment, etc.).

¶ 45     Next, Miriam argues that Perry's financial affidavit was erroneously admitted into evidence and relied upon by the trial court in arriving at its findings, where the affidavit is "almost entirely incorrect." She contends that Perry supplied no evidence to support the data in his affidavit concerning his income, debts, or details concerning the sale of his business. Miriam claims that Perry offered only his testimony, "which is not supported by any other evidence" and where he was found not credible. We reject Miriam's argument. Perry testified that his affidavit showed his obligations, not what he was actually paying. Further, as Perry notes, much of his testimony was unrebutted, including that: he sold all of the assets of his business; the note payments are entirely intercepted by the State to satisfy outstanding tax debt; social security is his sole source of income; and he took out a loan at 34% interest. Furthermore, we note that the trial court found neither party credible, and, again, much of Perry's testimony was unrebutted and Miriam raised legal theories, such as the alter ego rule (to question the sale of Plum Garden), that were irrelevant to the proceedings.

¶ 46     Miriam next argues that the maintenance provision in the parties' MSA was either non-modifiable or a property settlement/maintenance in gross. We disagree. Section 502(f) of the Act provides that, if the parties do not provide that maintenance is non-modifiable, then it is modifiable upon a substantial change in circumstances. 750 ILCS 5/502(f) (West 2018). Section 4.1 of the MSA provides that the $6,000 payment "is *non-modifiable for a period of nine (9) years*, at which time either party may seek a modification by petitioning the court." (Emphasis added.) The parties divorced in 2008 and Perry moved to terminate or modify maintenance in 2018, over 10 years later. Further, to the extent Miriam argues that the MSA provides that nine-year term was to begin only *after* the sale of the marital residence, which never occurred, we reject her argument. The trial court found that the dissolution judgment anticipated Perry's retirement when it set

maintenance for a nine-year term after the sale of the residence. However, the court also acknowledged the allegations that Miriam frustrated the sale of the property, a reference to Miriam's contempt finding for not selling the home, which she acknowledged the MSA required the parties to do. It ultimately determined that the MSA contemplated that maintenance would be reviewed in about 10 years ("assuming it took one year to sell the marital residence"). We conclude that the trial court's interpretation of the timeframe set forth in the MSA is reasonable. The MSA appears to contemplate that the nine-year period begins after the sale of the home, but the agreement also requires that the marital home be brought into salable condition and listed for sale. The court's finding that it should have taken about one year to sell the marital residence, at which point the nine-year period commenced, is reasonable when the agreement is read as a whole and especially in light of the contempt finding against Miriam for frustrating the MSA's terms.

¶ 47    Further, under section 504 of the Dissolution Act (750 ILCS 5/504 (West 2018)), there are four common types of maintenance: permanent maintenance, rehabilitative maintenance for a fixed term, rehabilitative maintenance with a review date, and maintenance in gross. *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 84. Rehabilitative maintenance is intended to assist and encourage dependent spouses to become financially independent. *In re Marriage of Henzler*, 134 Ill. App. 3d 318, 322 (1985). Inherent in the concept of rehabilitative maintenance is that the recipient is "under an affirmative obligation to seek appropriate training and skills to become financially independent in the future." *Id.* Permanent maintenance is "appropriate where it is evident that the recipient spouse is either unemployable or employable only at an income that is substantially lower than the previous standard of living." *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶ 18. The distinguishing characteristic of maintenance in gross from the other forms of maintenance is the definite amount and vesting date. *Shen*, 2015 IL App (1st) 130733, ¶

86. Here, the term "maintenance in gross" does not appear in the MSA. Further, there is no sum certain provided for in the MSA. See *In re Marriage of Freeman*, 106 Ill. 2d 290, 298 (1985) (maintenance in gross is "a nonmodifiable sum certain to be received by the former spouse regardless of changes in circumstances"). Instead, the agreement provides that Perry pay specific monthly amounts, and there is a triggering event—the sale of the marital residence—that changes the monthly payment amount (from $3,000 per month to $6,000 per month). Further, their agreement calls for a review (*i.e.*, the maintenance is modifiable) after nine years. None of these features indicates in any way that the payments in the MSA are not modifiable or constitute maintenance in gross. We also reject Miriam's argument, which is not entirely clear, that the MSA's real-estate article reflects that the parties waived maintenance. There is no such language in that article of the parties' agreement. We also find unavailing Miriam's argument that section 8.2 of the MSA, which is in the general-provisions article of the agreement, reflects that the parties waived maintenance. Section 8.2 contains the mutual releases and states that "except as otherwise herein expressly provided, *** each party hereby relinquishes, waives, remise and releases to the other, *** all rights of maintenance, alimony, [and] spousal support." The prefatory "except as otherwise" phrase clear reflects that the maintenance provision is an exception to section 8.2.

¶ 48      Miriam next argues that there are several inaccuracies in the trial court's written decision, including its findings concerning Perry's medical debt, loan, and banking records and findings concerning the tax consequences to the parties and the award and sale of the marital residence. However, she relies on exhibits that were not introduced at the hearing or were attached to earlier pleadings, a point she concedes in her reply brief. She also asserts that the trial court mistakenly found that there was no evidence presented of the tax consequences of the maintenance payments. We reject her argument. The MSA provides that the payments shall not be included in Miriam's

income and shall not be deductible from Perry's income for tax purposes. There was no evidence offered during the hearing to elaborate on this provision. Further, Miriam does not explain how, even if it is erroneous (for failing to mention the MSA provision), it bears on the court's termination of maintenance. For the same reason, her argument that the court's statement that the court erred in finding that "Miriam is still in possession of the major asset she received: the house" fails. Miriam argues that she was awarded possession. If Miriam implies that she does not own the house, we disagree that the trial court's finding is erroneous. It is clear from the trial court's decision as a whole that it did not interpret the MSA to have awarded sole ownership of the house to Miriam; indeed, it was jointly owned by the parties, and the trial court did not find otherwise. Further, the MSA provides that Miriam shall receive up to $400,000 of any proceeds from the sale of both the marital residence and the adjacent lot, plus half of any proceeds exceeding that figure. There is no indication in the record that the trial court misconstrued the parties' agreement.

¶ 49    Miriam's final argument is that the trial court erred in finding there was a substantial change in circumstances. First, she claims that Perry's retirement was voluntary and in bad faith. Second, she contends that the asset sale of the Plum Garden business was a fraudulent conveyance. Her bad-faith and fraudulent-conveyance arguments are forfeited, because she failed to raise them in the trial court. See, *e.g.*, *Einstein v. Nijim*, 358 Ill. App. 3d 263, 275 (2005) (failure to raise an issue in the trial court results in forfeiture of the issue on appeal). She also cites to documents she attached to a motion to dismiss that were not admitted at the hearing on Perry's motion to terminate maintenance.

¶ 50    The trial court's finding of a substantial change in circumstances was not erroneous. Consistent with a reasonable assessment of the evidence, the trial court found that Perry's retirement (he was 67 years old at the time of the hearing) was in good faith, based on his long

work hours and health concerns and where he sold his business to his children in installments and sold the building to pay off debts. The court noted that these were the only substantial assets of the marriage that were awarded to Perry. As to Miriam, the court found that she is no longer working, "but it is not clear why. That is not in good faith." It also found that she made no effort to become self-supporting. "She can spend hours preparing, copying and filing documents in this case, in her mortgage foreclosure cases and bankruptcy cases, but she cannot work for income?" The testimony certainly and reasonably supports out these findings, as Miriam essentially did not dispute this evidence.

¶ 51 Perry, the court noted, paid maintenance for 10 years. The marriage's duration was 25 years and, under the current statutory guidelines, "it is very likely that Miriam would have received permanent maintenance. Given the overall length of this marriage, the duration of maintenance in this case was relatively short." The parties' major assets consisted of the restaurant and the real property on which it stands, which Perry sold, and the marital home, which is in foreclosure. Addressing the parties' income, the court found that Perry's income has decreased by $80,000 per year and Miriam's income is zero and used to be between $8,000 and $10,000 per year. She has acquired two additional vehicles since the divorce, and Perry has acquired a townhouse that is in foreclosure. Neither party, the trial court found, "has any property of value," nor "has income sufficient to live." Their needs exceed their income, and, yet, "Miriam is somehow meeting her needs." These findings are not unreasonable. Miriam testified that she receives financial assistance from her sister and other relatives. She could not recall if she stopped working due to being fired or if she quit. She also claimed that she did not know how to file for unemployment compensation, while also asserting that she spends hours prosecuting various legal proceedings.

¶ 52  Addressing any impairment of the present or future earning capacity, as set forth in section 510(a-5) of the Act, the trial court determined that there is no such impairment to either party, but noted that Perry retired at age 67. Miriam, in turn, denied that she is disabled and has worked in the past, though stated she cannot work as a server. The court found that "she has no other limitations." Addressing the parties' present and future earning capacity and any impairments thereto, as set forth in section 504(a) of the Act, the trial court found that Perry worked long hours and has health concerns and that the potential payments from the sale of his business are being intercepted, as is a portion of his social security, to pay state and federal taxes. Miriam, age 57, showed no outward signs of her recent brain surgery and stated she was not disabled, although, at times, she spoke "labored and slow." (During trial and in its written order, the court commented that Miriam's demeanor and speech significantly improved during her closing argument.) The trial court determined that Miriam "has a future earning capacity; however, it is unknown what that capacity is because she hasn't tried." The evidence bears this out. During the hearing, Miriam testified that she never enrolled in job-training programs or classes. Indeed, the trial court determined, consistent with the evidence, that Miriam has not done anything in 10 years to acquire education or training, that she could conceivably work 10 years before retirement, and that minimal training could enable her to support herself and perhaps earn retirement benefits and build up her social security benefits. Both parties, the court further noted, would be eligible for public aid if they applied for it. Finally, the trial court found that the MSA contemplated that maintenance would be reviewed in about 10 years ("assuming it took one year to sell the marital residence").

¶ 53  Based on the foregoing findings, we conclude that the trial court reasonably determined that there was a substantial change in circumstances warranting a termination of maintenance.

¶ 54  III. CONCLUSION

¶ 55    For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 56    Affirmed.